**PALMER LAW, LLC**
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205) 285-3050

---

December 29, 2023

Clerk of Court
U.S. Court of Appeals for
     the Eleventh Circuit

RE:   *Daphne Berry v. Crestwood healthcare LP, et al*
       Docket No. 22-11129
       Citation of Supplemental Authority

Dear Clerk:

Appellant/Berry has filed a Petition for En Banc Review/Rehearing. Berry submits this letter brief of significant supplemental Circuit authority.

The Panel's opinion turns on the Court's pretext analysis, specifically looking at conduct Berry (and her supervisor) dispute, and distinguishing her from comparators by micro-specifying the conduct as "[in]comparable in degree or kind." *Panel Opinion* at 11-14, 20. Since *Berry*, the Circuit has published two more opinions considering the same type of disputed conduct and evidence with completely different results. *See Phillips v. Legacy Cabinets,* _F.4th_, 2023 U.S.App. LEXIS 32550 (Dec. 8, 2023). (Attached Ex. A). *Tynes v. Fl. Dept. Juvenile Justice*, _F4th_, 2023 U.S.App. LEXIS 32836 (Dec. 12, 2023). (Attached Ex. B).

Comparing the published opinions and concurrences/dissents in *Ossman v. Meredith Corporation*, 82 F.4th 1007 (11th Cir. Sept. 8, 2023), *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329 (11th Cir. Oct. 5, 2023), *Berry*, *Phillips,* and *Tynes* – the five cases over the last four months exhibit a clear disagreement at the appellate and district court levels as to how we assess the evidence of causation under the varying frameworks.

Most recently, in *Tynes*, the Circuit noted the continued confusion between evidentiary frameworks and standards of liability stating sometimes courts "wrongly treat the prima facie case as a substantive standard of liability." *Tynes at* *9. The concurrence speaks volumes to the issue noting we allow the "tool to eclipse (and displace) the rule." *Tynes* at *28.

This case presents an opportunity for the Circuit, *en banc*, to consolidate the holdings in these various cases into a comprehensive standard for evaluating discrimination cases at summary judgment.

Sincerely,

Leslie Palmer
Counsel for Daphne Berry

I hereby certify that the body of the foregoing contains 266 words counted by Microsoft Word in compliance with Fed. R. App. P. 28(j) and I.O.P. 6. I certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Leslie Palmer

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE</u> <u>DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel of record for the Appellant hereby certifies the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations (including subsidiaries, conglomerates, affiliates, parent corporations and any publicly held corporation which owns 10% or more of the party's stock), and other identifiable legal entities related to a party that has an interest in this case.

1. Averitt, Anne Knox – Counsel for Appellees

2. Berry, Daphne – Appellant

3. Bradley Arant Boult Cummings, LLP – Law Firm of Appellees' Counsel

4. Burke, Hon. Liles C., United States District Court for the Northern District of Alabama

5. CHS/Community Health Systems, Inc. – parent company of Appellee CHSPSC, LLC and indirect parent company of Crestwood Hospital, LLC, publicly traded with stock ticker "CYH"

6. CHS Professional Services, LLC (aka CHSPSC, LLC) - Appellee

7. Crestwood Healthcare, L.P. – Appellee

8. Crestwood Hospital, LLC – general partner of Appellee Crestwood Healthcare, L.P.

9. Hargrove, John W. – Counsel for Appellees

10. Palmer, Leslie A. – Counsel for Appellant

11. Palmer Law, LLC – Law Firm of Appellant's Counsel

12. Vaughan, Sarahanne – Counsel for Appellees

Respectfully Submitted,

Leslie Palmer
Counsel for Daphne Berry

Exhibit A

Supplemental Authority

*Phillips v. Legacy Cabinets,* _F.4th_,

2023 U.S.App. LEXIS 32550 (Dec. 8, 2023).

## *Phillips v. Legacy Cabinets*

United States Court of Appeals for the Eleventh Circuit

December 8, 2023, Decided

No. 22-10057

**Reporter**

2023 U.S. App. LEXIS 32550 *; 30 Fla. L. Weekly Fed. C 457; __ F.4th __

THERESA PHILLIPS, Plaintiff-Appellant, versus LEGACY CABINETS, Defendant-Appellee.

**Prior History: [*1]** Appeal from the United States District Court for the Northern District of Alabama. D.C. Docket No. 1:20-cv-01548-CLM.

*Phillips v. Legacy Cabinet, 2021 U.S. Dist. LEXIS 247385, 2021 WL 6137294 (N.D. Ala., Dec. 29, 2021)*

**Counsel:** For THERESA PHILLIPS, Plaintiff - Appellant: Jon C. Goldfarb, Lieselotte Carmen-Burks, Christina M. Malmat, L. William Smith, Wiggins Childs Pantazis Fisher & Goldfarb, LLC, BIRMINGHAM, AL.

For LEGACY CABINET, Defendant - Appellee: Mark T. Waggoner, Hand Arendall Harrison Sale, LLC, BIRMINGHAM, AL; Christine Harding Hart, Hand Arendall Harrison Sale, LLC, MOBILE, AL.

**Judges:** Before WILSON and JILL PRYOR, Circuit Judges and COVINGTON,[*] District Judge.

**Opinion by:** JILL PRYOR

# Opinion

JILL PRYOR, Circuit Judge:

Theresa Phillips worked for over six years at a factory run by Legacy Cabinets. Her manager, Derrick O'Neal, fired her in 2019. Phillips is a white woman; O'Neal is a Black man. O'Neal says he fired Phillips for insubordination after she repeatedly complained about having to work over the weekend and then publicly insulted O'Neal on the factory floor. Phillips says O'Neal fired her because she is white. She denies insulting O'Neal and claims that two Black coworkers who

complained about their schedule alongside her were not punished at all.

After her termination, Phillips sued Legacy, alleging employment **[*2]** discrimination under Title VII and *42 U.S.C. § 1981*. The district court granted Legacy's motion for summary judgment, concluding that Phillips had presented no evidence of discriminatory intent. We disagree.

Viewing the evidence in the light most favorable to Phillips, as we must at this stage, we hold that a reasonable jury could find that Legacy discriminated against Phillips when it punished her more harshly than her Black coworkers for similar conduct. And so we reverse the district court's grant of summary judgment to Legacy and remand for further proceedings.

## I. BACKGROUND

### A. Phillips's Termination

Legacy Cabinets, LLC, is a cabinet manufacturer based in Eastaboga, Alabama. Theresa Phillips, a white woman, began working for Legacy in 2013, first as a temporary worker and eventually as a full-time employee. Phillips worked on a "hanging line," inspecting and repairing cabinets overhead with about 18 other employees.

Phillips and her coworkers on the hanging line were supervised by a line leader and an operations manager, who oversaw other departments as well. When she was terminated, Phillips's line leader was Shayne Hanna, a white man, and her operations manager was Derrick O'Neal, a Black man. Around **[*3]** the time O'Neal took over as operations manager, Legacy was busy enough that employees "started working longer hours and longer shifts," sometimes putting in "12 to 14 hours Monday through Sunday." Doc. 15-1 at 16.[1] By the time

---

[*] Honorable Virginia M. Covington, United States District Judge for the Mid-dle District of Florida, sitting by designation.

[1] "Doc." numbers refer to the district court's docket entries.

Phillips was fired, this schedule was beginning to take its toll on employee morale.

One Friday, O'Neal gathered his team for their daily "huddle" and informed them that they would have to work the next day—with the promise that they would have Sunday off. Predictably, Phillips and her coworkers were unhappy about the news, and many expressed frustration that they were working so much.

The next day, several members of the team were late or absent. Derrick Stockdale, one of Phillips's Black coworkers, arrived two hours late, coming in only after someone called to remind him. Even Hanna, the line leader, failed to show up on time. Because of these absences, the team fell further behind schedule, and the plant managers decided that the employees would need to work on Sunday after all. Once again, O'Neal gathered the employees for their daily huddle and relayed the news.

Phillips and Legacy agree that most team members were unhappy and there was "moaning and groaning" **[*4]** all around. Doc. 15-2 at 21. They also agree that Phillips, Stockdale, and Tavia Craig—another of Phillips's Black coworkers—all spoke up during the huddle. But Phillips and Legacy disagree about the way in which Phillips addressed O'Neal in that moment, and they dispute what happened between Phillips and O'Neal later.

### 1. Phillips's Version of the Facts

According to Phillips, when O'Neal announced that employees would have to work on Sunday, Stockdale and Craig "were loud," saying that "they didn't want to work" and "cussing" with words like "hell and damn and the 'F' word." Doc. 15-1 at 23. Phillips nodded her head in agreement with Stockdale and Craig but did not speak up until O'Neal specifically asked, "Have you got something you want to say?" *Id.* Phillips responded that "it was unfair that [she and her coworkers] had been working these late hours and long weeks" and pleaded that they were "all tired." *Id.* At this point, O'Neal "started blowing up" and "getting really angry." *Id.* He told Phillips that Alabama was a right-to-work state and he could set whatever hours he wanted. O'Neal then sent everyone home except Phillips, whom he asked to stay back and go to his office with Hanna. **[*5]**

Once in his office, O'Neal suspended Phillips until Monday. During their conversation, O'Neal reminded her that he had recently given her a ten-dollar Chick-fil-A gift

card "[f]or doing a good job." *Id.* at 16. Phillips replied that the gift card was still in her car "if he wanted it back," but O'Neal said that he did not. *Id.* at 26-27. Phillips then walked out of the office with O'Neal, while Hanna walked in the other direction.

As soon as Hanna was gone, O'Neal turned around "real quick," "got in [Phillips's] face," and, unprovoked, told her she was fired. *Id.* at 27. He also said that she should not apply for unemployment or look for another job in the cabinet industry "because he would make sure [she] didn't get it." *Id.* at 25. Then, while Phillips was "just standing there," O'Neal called someone on the radio and said that Phillips was being "irate." *Id.* When Phillips told O'Neal that this was "stupid" because she had just been "standing there" silently, O'Neal falsely relayed on the radio that Phillips had called *him* stupid. *Id.* Phillips eventually gathered her belongings and was escorted off the premises. Legacy later told Phillips that she had been fired for "insubordination," but **[*6]** it would not elaborate further.[2]

### 2. Legacy's Version of the Facts

Legacy presents a different version of events. According to O'Neal, when he gathered his team for their Saturday huddle and told them they would need to work on Sunday, "[Phillips] and a couple more guys[] kept interrupting." Doc. 15-2 at 21. Unlike Phillips, neither O'Neal nor Hanna recalled any cursing from Stockdale or Craig. When O'Neal asked for the chirping to stop, "everyone except [Phillips] kind of backed off and let [him] finish talking." *Id.* But Phillips continued to interrupt, "saying it's against the law, that you can't schedule us to work on Sunday." *Id.* Once he was done, O'Neal dismissed everyone except Phillips. He then asked her and Hanna to come to his office because he was "shocked at [Phillips's] attitude." *Id.* at 22.

As the trio walked to his office, O'Neal said, Phillips continued to insist that he could not schedule her to work on Sunday. O'Neal responded that he could "schedule it and you can choose to come or not." *Id.* at 22. Phillips then "went on telling [O'Neal] that this place [is] going to crap . . . because of [him]" and that he

---

[2] The Legacy employee handbook states that conduct such as: (1) "deliberately interfering with operations"; (2) "insubordination or refusal to carry out any instruction from a supervisor"; or (3) using "profanity" could result in disciplinary action "up to and including immediate termination of employment."

"didn't know what [he] was doing." *Id.* Noting that she was "disgruntled," **[*7]** O'Neal suggested that Phillips go home until Monday—though he assured her that she was not fired. *Id.*

After they left O'Neal's office, Phillips continued to be disruptive, stopping other employees to complain and calling O'Neal "stupid" several times. O'Neal warned Phillips that if she called him stupid again he would have to fire her. Undeterred, she responded, "[y]ou are stupid, and this place is going to shit." *Id.* at 23. As promised, O'Neal fired Phillips on the spot and escorted her out of the building. Later, during his deposition, O'Neal explained that he fired Phillips "[f]or being insubordinate and disrespectful out on the floor" and for resorting to "name calling" because he "didn't want that to spread through the floor . . . the way she was being disrespectful to a manager." *Id.* at 30.

## B. Phillips's Lawsuit Against Legacy

Phillips sued Legacy, alleging that she was fired because of her race in violation of Title VII and *42 U.S.C. § 1981*. Her complaint alleged that race was the but-for cause of her firing—known as a "single-motive" or "pretext" theory of discrimination—or, in the alternative, that it was "at least a motivating factor in the termination decision"—known as a "mixed-motive" theory. **[*8]**

After discovery, Legacy moved for summary judgment, arguing that Phillips could not satisfy the three-part burden-shifting framework for single-motive discrimination cases articulated in *McDonnell Douglas*.[3] Legacy argued that Phillips could not establish a prima facie case of discrimination because she could not point to a valid non-white comparator whom O'Neal treated more favorably than her. Even if Phillips could establish a prima facie case, Legacy argued, summary judgment was appropriate because the company had proffered a legitimate, nondiscriminatory reason for firing her—insubordination—and she had no evidence showing that this reason was pretextual.[4]

---

[3] *McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*.

[4] Legacy's motion for summary judgment did not explicitly address Phillips's mixed-motive theory. Prodded *sua sponte* by the district court, Legacy filed supplemental briefing on this issue, arguing that (1) Phillips could not rely on a mixed-motive theory because she would not concede that Legacy

Phillips urged the court to deny Legacy's motion and allow her to proceed to trial. In support of her prima facie case, Phillips identified at least 14 non-white employees whom she said Legacy had treated more favorably than her. Specifically, she pointed to Stockdale and Craig, both of whom made disruptive comments at the Saturday huddle without punishment. She also presented disciplinary records from Legacy showing 12 instances in which other non-white employees engaged in insubordinate conduct but were not fired. At least **[*9]** three of these employees—Tavia Slater, Kathy Groce, and Taneesha Williams—were supervised by O'Neal. Although O'Neal's testimony suggested that Phillips had been more disruptive than her proposed comparators, Phillips's own testimony contradicted that account. Given these competing narratives, Phillips argued, a reasonable jury could find that she was punished more harshly than her non-white comparators for similar conduct; therefore, she satisfied the first step of the *McDonnell Douglas* framework.

Next, Phillips argued that her own testimony's inconsistency with Legacy's proffered reason for her termination supported an inference of pretext. According to Phillips, this evidence of pretext, combined with her comparator evidence, was enough for a reasonable jury to find that race was the real "but for" cause of her termination. Alternatively, she argued that her comparator evidence supported an inference that race was at least "a motivating factor" in O'Neal's decision to fire her, precluding summary judgment on her Title VII claim under a mixed-motive theory of discrimination.

## C. The District Court's Decision

The district court granted Legacy's motion for summary judgment. To start, the court agreed with **[*10]** Phillips that she had established a prima facie case of discrimination, satisfying the first step of the *McDonnell Douglas* framework. Rejecting Legacy's argument to the contrary, the court found that Phillips had identified at least two valid, non-white comparators, concluding that "a reasonable juror could find . . . that Phillips was similarly situated to Stockdale and [Craig] during the Saturday group meeting or to other minority employees that O'Neal called to his office but did not fire." Doc. 29 at 12. Because these non-white comparators were treated more favorably than Phillips for (by her telling)

---

had any legitimate reasons for firing her, and (2) even if Phillips could assert a mixed-motive theory, she had no evidence that race was "a motivating factor" in her termination.

similar conduct, the court determined that Phillips had made out her prima facie case. But the court also concluded that Legacy had sufficiently rebutted any presumption of discrimination by presenting a valid, nondiscriminatory reason for Phillips's termination—her insubordinate comments to O'Neal both during the huddle and after they met in his office.

The final blow to Phillips's case came at the pretext stage, in which the court considered whether Phillips could establish that Legacy's proffered reason for her termination was merely a pretext for racial discrimination. The court concluded that, **[*11]** even accepting Phillips's testimony and viewing the facts in the light most favorable to her, Phillips had established only "pretext of *something*." *Id.* at 13. In the court's view, "Phillips ha[d] no evidence from her incident that would prove that O'Neal fired her because she was white." *Id.* at 14. Although disciplinary records showed that O'Neal had failed to fire Black employees for insubordinate conduct, the court said, these records, "viewed as a whole, tend[ed] to *disprove* Phillips'[s] claim," because at least two white employees were spared as well. *Id.* The court made no mention at this stage of Stockdale or Craig, the two comparators closest to Phillips.

The district court also granted Legacy's motion with respect to Phillips's mixed-motive theory. According to the court, "Phillips fail[ed] to prove a mixed-motive case for the same reasons" that she failed to establish pretext—there was simply no "evidence that would allow a reasonable juror to find that race played a role in O'Neal's decision to fire Phillips." *Id.* at 17. The district court thus entered summary judgment for Legacy.

This is Phillips's appeal.

## II. STANDARD OF REVIEW

"We review a district court's grant of summary **[*12]** judgment *de novo*, viewing all evidence and drawing all reasonable inferences in favor of the non-moving party." *State Farm Mut. Auto. Ins. Co. v. Spangler, 64 F.4th 1173, 1178 (11th Cir. 2023)*. Summary judgment is appropriate when the evidence, viewed in that light, presents no genuine dispute of material fact and compels judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A factual dispute is genuine if it has a real basis in the record and the evidence is such that a reasonable jury could rule in favor of the nonmovant. *Ellis v. England, 432 F.3d 1321,*

*1325-26 (11th Cir. 2005)*. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012)*.

## III. DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." *42 U.S.C. § 2000e—2(a)(1)*. Similarly, "*[s]ection 1981* prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999)*; *see 42 U.S.C. § 1981*. Discrimination claims brought under Title VII may be pursued under a "single-motive" theory—in which the employee alleges that unlawful bias was "the true reason" for an adverse employment action, *Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016)*—or a "mixed-motive" theory—in which she alleges **[*13]** that bias was simply "*a motivating factor*" for the adverse action, "even though other factors also motivated the practice," *42 U.S.C. § 2000e—2(m)* (emphasis added). *Section 1981* claims brought alongside Title VII claims may be pursued under the single-motive theory only. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020)*.[5]

Phillips argues that she should be allowed to proceed to trial on both theories. For the reasons stated below, we agree.

### A. Phillips's Single-Motive Theory

Where, as here, an employee bases her single-motive discrimination claim on circumstantial evidence, we generally apply the *McDonnell Douglas* burden-shifting framework. *McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008)*. Under this framework, the employee must first establish a prima facie case of discrimination by showing that (1) "she belong[ed] to a protected

---

[5] Single-motive discrimination claims brought under Title VII and *§ 1981* "are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009)*.

class," (2) "she was subjected to an adverse employment action," (3) "she was qualified to perform the job in question," and (4) her "employer treated similarly situated employees outside her class more favorably." *Lewis v. City of Union City, 918 F.3d 1213, 1220-21 (11th Cir. 2019)* (en banc) (internal quotation marks omitted). If the employee establishes a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its actions. *Id. at 1221*. If the employer articulates such a reason, the employee must then show that the employer's stated **[*14]** reason was merely a pretext for unlawful discrimination. *Id.*

Here, the district court determined that Phillips had made out a prima facie case and could show that Legacy's proffered reason was "pretext of *something*." Doc. 29 at 13. But the court concluded that Phillips had failed to show that unlawful discrimination was the true reason for her termination.

Phillips argues that this conclusion was flawed. Her evidence of pretext, combined with the comparator evidence considered by the court at the prima facie stage, should have been enough to send her case to the jury, she says. Legacy disagrees. It argues that the district court erred in the first place by concluding that Phillips had made out a prima facie case. And even if she could make out a prima facie case, Legacy says, she failed to show that its explanation for her firing was pretextual, let alone that it was a pretext for racial discrimination.

We begin by addressing Legacy's contention that Phillips failed to make out a prima facie case. We then consider whether she has presented sufficient evidence from which a reasonable jury could determine that Legacy's proffered explanation for her firing was a pretext for race discrimination. **[*15]**

1. Phillips Has Made Out a Prima Facie Case of Discrimination.

Legacy does not dispute that Phillips made out the first three elements of a prima facie case: (1) she was a member of a protected class, (2) she suffered an adverse employment action, and (3) she was qualified for her position. The only issue at this stage, then, is the fourth element, whether Phillips has shown that Legacy "treated similarly situated employees outside her class more favorably." *Lewis, 918 F.3d at 1221*. We agree

with the district court that Phillips has met this burden.[6]

"[A] plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were similarly situated in all material respects." *Id. at 1218* (internal quotation marks omitted). Generally, this means that a comparator will (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; and (4) share the plaintiff's employment or disciplinary history. *Id. at 1227-28*.

Phillips identified at least 14 non-white comparators who worked with her at Legacy, but much of her argument focuses **[*16]** on just two: Stockdale and Craig. Phillips says that both men were present during the Saturday huddle and "started fussing" when O'Neal mentioned that they would need to work on Sunday, raising their voices to argue with O'Neal and using words like "[h]ell and damn and the 'F' word" to express their displeasure. Doc. 15-1 at 23. Despite this disruptive and disobedient conduct, Phillips says, O'Neal focused his anger—and disciplinary actions—on her, even though she simply "agreed that it was unfair that [they] had been working these late hours and long weeks." *Id.*

We conclude that a reasonable jury could find that Stockdale and Craig engaged in similar conduct yet were treated differently. Legacy does not dispute that these men were subject to the same workplace policies as Phillips, fell under the same supervisor, and had similar employment histories. Nevertheless, Legacy argues that Stockdale and Craig are not similarly situated to Phillips because "neither of them continued to interrupt O'Neal as he was speaking to the group" in the Saturday huddle, and neither of them made "disrespectful and insubordinate comments towards O'Neal" after being taken to his office. Appellee's Br. at **[*17]** 29. But this distinction turns on conduct that Phillips denies—a dispute of fact that renders this issue unsuitable for adjudication at the summary judgment stage. *See Strickland, 692 F.3d at 1154* ("Credibility determinations, the weighing of the evidence, and the

_____

[6] An employee may also satisfy the fourth element of her prima facie case by showing that she was "replaced by someone outside of [her] protected class." *Flowers v. Troup Cnty., Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015)*. Here, as the district court found, "Phillips sufficiently established that she was replaced by a non-white employee." Doc. 29 at 10 n.2.

drawing of legitimate inferences from the facts are jury functions, not those of a judge." (internal quotation marks omitted)).

Although it is a closer question, a reasonable jury could also find that three more of Phillips's coworkers—Slater, Groce, and Williams—engaged in similar conduct without comparable punishment. According to Legacy's own records, O'Neal disciplined each of these employees for insubordination during their time with the company. Slater, for example, was verbally reprimanded for telling O'Neal that "she [was] going home" if he did not turn on a fan, Doc. 17-4 at 5; Groce was given a written warning for "using offensive profanity towards her supervisor," *id.* at 12; and Williams was admonished for repeatedly "verbaliz[ing] negative opinions about other team members and superv[isors] in group settings," *id.* at 2. Likewise, Legacy's records reflect that when O'Neal heard Williams continue to "comment" on the issue, he asked her to return **[*18]** to his office, but she refused. *Id.* This is evidence from which a jury could find that, like Phillips, each of these employees engaged in some form of insubordinate conduct. Unlike Phillips, none of them was fired.

As with Stockdale and Craig, Legacy argues that Slater, Groce, and Williams are not valid comparators because they did not "engage[] in the same[] highly unique conduct as Phillips"—that is, continuing to argue with and make disrespectful comments toward O'Neal after being told to stop. Appellee's Br. at 30. But, again, this argument presupposes that O'Neal's version of events is correct, a determination that this Court is not permitted to make.

Because a reasonable jury could decide to credit Phillips's testimony over O'Neal's—and thus find that Phillips was punished more harshly than her similarly situated non-white coworkers—the district court did not err in determining that Phillips had made out her prima facie case.

2. Phillips Has Presented Evidence of Pretext for Racial Discrimination.

Phillips does not dispute that Legacy has proffered a legitimate reason for her termination. Indeed, O'Neal's account of Phillips's repeated insubordination—if true— would be an understandable **[*19]** reason to end her employment. O'Neal's testimony thus was sufficient to dispel any presumption created by Phillips's prima facie case and shift the burden back to her to demonstrate that this explanation was simply a pretext for unlawful discrimination. *See Combs v. Plantation Patterns, 106*

*F.3d 1519, 1528 (11th Cir. 1997).* The district court concluded that Phillips had fallen short: although a reasonable juror could find that Legacy's reason was "pretext of *something*," the court said, Phillips had presented no evidence that it was a pretext for racial discrimination. We disagree.

Once an employer has offered evidence of a legitimate, nondiscriminatory reason for its action, the burden shifts to the plaintiff to show the asserted reason was pretextual. This burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).* "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* However, "[s]howing only that the employer's proffered reason is false does not necessarily entitle a plaintiff to get past summary judgment." *Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1264 (11th Cir. 2010).* To **[*20]** survive summary judgment, a plaintiff must present sufficient evidence for a reasonable jury to conclude "not just that [the employer's] proffered reasons for firing her were ill-founded but that unlawful discrimination was the true reason." *Id. at 1267.*

We start by considering whether Phillips has presented sufficient evidence for a reasonable jury to conclude that Legacy's proffered reason for firing her was pretextual. We then address the question at the core of this appeal: whether Phillips can show that the true reason for her termination was unlawful discrimination.

*(a) Phillips's Evidence of Pretext*

To establish pretext, an employee must "cast sufficient doubt on the [employer's] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that [they] were not what actually motivated its conduct." *Combs, 106 F.3d at 1538* (internal quotation marks omitted). The employee achieves this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (internal quotation marks omitted).

Viewing the evidence in the light most favorable **[*21]** to Phillips, we conclude that she can show that Legacy's

proffered reason for firing her was false. Although O'Neal says that he fired Phillips for arguing with him during the huddle and then repeatedly calling him "stupid" and criticizing his leadership after he suspended her for the weekend, Phillips denies that any of this happened. Thus, if a jury chooses to believe Phillips over O'Neal, it will likely conclude that Legacy's proffered explanation is false and that she was fired for some other reason.

Legacy argues that Phillips's "general denials" are not enough to establish pretext. Appellee's Br. at 24. "Phillips may dispute some of what she said," and she may deny being disrespectful or insubordinate, "but she cannot demonstrate that O'Neal's reasons to terminate her were false or that O'Neal's subjective response to the comments that she made to him was false." *Id.* at 34.

Legacy is correct that an employee is "not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer." *Id.* at 32 (quoting *Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)* (en banc)). It is also correct that "[t]he inquiry into pretext centers on the employer's beliefs" about the employee's [*22] conduct, "not the employee's beliefs" about her own actions. *Id.* at 33 (quoting *Alvarez, 610 F.3d at 1266*); *see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004)* ("Whether [an employee's] conduct was insubordinate is not an issue for this Court to referee."), *abrogated on other grounds by Lewis, 918 F.3d at 1218.* Phillips could not prevail, then, by arguing that she did not believe her actions to be insubordinate or that she should not have been fired for her insubordinate conduct—but that is not what she says. Instead, Phillips insists that the conduct itself never happened.

Phillips does admit that she and others spoke up during the Saturday huddle and complained about having to work on Sunday. But Legacy has never suggested that this conduct alone was the reason for her termination. Nor could it, given Phillips's claim that Stockdale and Craig were also "fussing" and "cussing" at O'Neal during that time.[7] Doc. 15-1 at 23. Indeed, Legacy argues that

Phillips was not fired until *after* she accompanied O'Neal to his office and "continued to make disrespectful and insubordinate comments towards O'Neal," Appellee's Br. at 29—comments that Phillips denies making at all.[8] Because the plausibility of Legacy's proffered reason for firing Phillips depends entirely on disputed issues [*23] of fact, the district court did not err in concluding that a reasonable jury could find that this reason was pretextual. But the core question remains: is there sufficient evidence for a jury to find that the real reason was unlawful discrimination?

### (b) Phillips's Evidence of Racial Discrimination

"The critical decision that must be made is whether the plaintiff has create[d] a triable issue concerning the employer's discriminatory intent." *Flowers v. Troup Cnty., Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015)* (internal quotation marks omitted). "Title VII functions only as a bulwark against unlawful discrimination; it does not substitute the business judgment of federal courts for any other nondiscriminatory reason." *Id. at 1330.* As this court repeatedly has recognized, "employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id. at 1338* (internal quotation marks omitted). It is not enough, in other words, for Phillips to prove that Legacy is lying about the true reason for her termination; to escape summary judgment, she must produce sufficient evidence for a reasonable jury to find that the true reason was discrimination.

The district [*24] court concluded that Phillips had not met that burden. We think she has. Put simply, Phillips's evidence of pretext, *combined* with her testimony

---

[7] To be clear, Legacy is free to argue before a jury that Phillips's conduct during the huddle was measurably worse than that of Stockdale and Craig and thus warranted disparate treatment. At the summary judgment stage, however, this claim conflicts with Phillips's own testimony that she spoke up only after O'Neal asked for her opinion and then said only: "I

don't think it's fair. We're all tired." Doc. 15-1 at 22.

[8] According to Legacy, Phillips "does not dispute" that she made insubordinate comments after being called into O'Neal's office, including saying that "it was illegal to work on Sundays," that O'Neal "did not know how to talk to people or how to treat people," and that she would return the Chick-fil-A gift card O'Neal gave her for being a good worker. Appellee's Br. at 34. This argument falls flat. To start, Phillips does appear to dispute telling O'Neal that it was illegal to work on Sundays, and she does not admit telling O'Neal that he did not know how to treat people. And even though Phillips agrees that she offered to give back the Chick-fil-A gift card, O'Neal never suggested that this statement influenced his decision to fire her.

describing how O'Neal treated her more harshly than her similarly situated non-white comparators, is sufficient for a reasonable jury to find discriminatory intent. This is especially true with respect to Stockdale and Craig, two non-white employees who allegedly engaged in similar conduct as Phillips at a similar time and yet went unpunished.

Legacy argues that this evidence is not enough. "Even if the Court were to . . . consider [Stockdale and Craig]," Legacy says, "that plus the limited record that Phillips presented of other disciplinary records is not sufficient to establish evidence of discrimination." Appellee's Br. at 14. Legacy's argument is twofold. First, it says, Phillips was treated differently for different conduct, undermining any claim of discrimination. "[W]hat happened to Phillips is not comparable to [Stockdale or Craig]," Legacy argues, because neither of them engaged in the same disruptive and insubordinate conduct as Phillips—during the huddle or after. Id. at 36. This argument, rejected at every stage of our analysis [*25] so far, is no more convincing here. It again ignores the fact that, by Phillips's telling, she did not engage in the conduct O'Neal alleged. Whether this testimony is credible is a matter for the jury to decide. Should a jury believe it, however, O'Neal's decision to single out Phillips for punishment while ignoring similar—or worse—conduct from Stockdale and Craig provides at least some evidence of discriminatory intent. The same may be said of O'Neal's more forgiving treatment of Slater, Groce, and Williams—Phillips's other non-white comparators.[9]

Second, Legacy argues that "a prima facie case does not, on its own, establish pretext." Id. at 40. Quoting this Court's decision in Flowers, Legacy insists that "making a prima facie case and merely contradicting the [defendant]'s proffered legitimate, nondiscriminatory reason" is no longer enough to escape summary judgment. Id. (quoting 803 F.3d at 1339). Now, an employee must "produce additional evidence suggesting discrimination after contradicting their employer's stated reasons." Id. (quoting 803 F.3d at 1339) (emphasis added by Legacy).

It is true that, in Flowers, this Court determined that the employee's evidence of pretext, combined with his prima facie [*26] case, was not enough to support a finding of discrimination—but the key component of that decision was the employee's lack of valid comparators. 803 F.3d at 1338-40. In that case, we explicitly rejected the employee's proposed comparator evidence, noting that "[t]he obvious differences between Flowers's circumstances and those of his purported comparators are hardly the stuff of an apples-to-apples comparison." Id. at 1340.[10] Lacking valid comparators, this Court noted that "[t]he only evidence that Flowers offers that even touches on his race is the fact that he became the first black head football coach in Troup County since 1973." Id. at 1338.

Here, the mere fact that Phillips can establish her prima facie case and show "pretext of something" is insufficient to escape summary judgment. But the specific evidence she used to get to that point—including evidence of potential comparators—is enough that a reasonable jury who believes Phillips's testimony may find discriminatory intent. See Wilson, 376 F.3d at 1088 ("[E]vidence of pretext may include . . . the same evidence offered initially to establish the prima facie case."); see also Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998) (recognizing that "the evidence in a prima facie case might be strong enough to also show pretext"). [*27] It is certainly true that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted

---

[9] The district court made no mention of Stockdale or Craig at the pretext stage of its analysis. Addressing Phillips's other comparators, however, the court concluded that "the disciplinary records, when viewed as a whole, tend to disprove Phillips'[s] claim of racial bias" because O'Neal had not fired two other white employees for insubordinate conduct at other times in his tenure. Doc. 29 at 14 (emphasis in original) (citations omitted). But Title VII does not "give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." Connecticut v. Teal, 457 U.S. 440, 455, 102 S. Ct. 2525, 73 L. Ed. 2d 130 (1982). The ultimate question is not whether O'Neal discriminated against all white subordinates, but whether he discriminated against Phillips because she was white. Evidence that O'Neal failed to fire other white employees for insubordination, "although relevant" to the question of his intent, "is certainly not dispositive," and is better left to the jury to weigh against Phillips's own comparator evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

---

[10] The district court in Flowers determined that the employee had established his prima facie case "without evidence that similarly situated comparators were treated differently" because he was replaced by someone of a different race. Flowers v. Troup Cnty., Ga., Sch. Dist., 1 F. Supp. 3d 1363, 1366 (N.D. Ga. 2014); see also id. at 1371 n.8. Neither party challenged this determination on appeal. Flowers, 803 F.3d at 1333.

justification is false," will not always be enough to support a finding of unlawful discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).[11] But, depending on the circumstances, that combination may be enough to send the issue to a jury. *Id.* The district court thus erred in granting Legacy's motion for summary judgment on Phillips's single-motive theory of discrimination.

## B. Phillips's Mixed-Motive Theory

Unlike Title VII claims brought under a single-motive theory of discrimination—which "require a showing that bias was the true reason for [an] adverse action"— claims brought under a mixed-motive theory require the employee to show only "that illegal bias . . . 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting *42 U.S.C. § 2000e-2(m)*). This requirement "can be established with either direct or circumstantial evidence." *Id.* But, because the mixed-motive theory does not depend on "proof of a single, 'true reason' for an adverse action," an employee relying on circumstantial evidence is not required to satisfy the *McDonnell Douglas* burden-shifting framework. *Id. at 1237.* Instead, [*28] she can survive summary judgment simply by producing "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff and; (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Id. at 1232-33.*

Here, the district court concluded that Phillips could not proceed under her mixed-motive theory "for the same reasons" that she "could not prove pretext under *McDonnell Douglas*—*i.e.*, [she] fail[ed] to present evidence that would allow a reasonable juror to find that race played a role in O'Neal's decision to fire [her]." Doc. 29 at 17.[12] Unsurprisingly, Legacy agrees. According to

Legacy, "[t]he only possible evidence of discrimination that Phillips cites in support of her argument that race was a motivating factor [is] O'Neal's allegedly more favorable treatment of other black employees." Appellee's Br. at 48. This comparator evidence, Legacy argues, "falls short of [implying] that Phillips's race was a motivating factor" in her termination. *Id.* But we have already held that Phillips's comparator evidence is sufficient for her to proceed to trial on her arguably more burdensome single-motive theory. Therefore, the district [*29] court erred in granting Legacy's motion for summary judgment on Phillips's mixed-motive theory of discrimination.[13]

---

judgment on her mixed-motive theory of relief and that the district court erred by *sua sponte* directing Legacy to brief the issue. But Legacy acknowledged Phillips's mixed-motive theory in its motion for summary judgment and argued that Phillips had failed to provide evidence of *any* discriminatory intent, an argument applicable to either theory. The district court then allowed the parties to submit additional briefing on Phillips's mixed-motive theory. "[S]o long as the party against whom judgment will be entered is given sufficient advance notice and has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted, then granting summary judgment *sua sponte* is entirely appropriate." *Burton v. City of Belle Glade, 178 F.3d 1175, 1204 (11th Cir. 1999).*

[13] In addition to its arguments on the merits, Legacy insists that Phillips cannot proceed under a mixed-motive theory because she "has always disputed that she engaged in behavior that warranted her termination and has consistently asserted that the reason for her termination was pretextual and false." Appellee's Br. at 44. According to Legacy, in other words, Phillips cannot claim that racial discrimination was "*a* motivating factor" in her termination without first conceding that [*30] it was not the "single, true reason" for it. To support its position, Legacy cites a series of unpublished decisions for the proposition that "a single-motive case is not transformed into a mixed-motive case merely because the employer raises a legitimate, non-discriminatory reason for its actions." *Id.* at 45 (quoting *Smith v. Vestavia Hills Bd. of Educ., 791 F. App'x 127, 131 (11th Cir. 2019)* (unpublished). Unpublished decisions, of course, are not binding. *Searcy v. R.J. Reynolds Tobacco Co., 902 F.3d 1342, 1355 n.5 (11th Cir. 2018).* Further, unlike the plaintiffs in Legacy's cited cases, Phillips has pleaded and argued a mixed-motive theory from the start. *Compare* Doc. 1 ¶ 35 ("[E]ven if [Legacy] had legitimate reasons for terminating her, [Phillips's] white race was at least a motivating factor in the adverse employment actions [Legacy] took against her."), *with Fonte v. Lee Mem'l Health Sys., No. 20-13240, 2021 U.S. App. LEXIS 34256, 2021 WL 5368096, at *4 (11th Cir. Nov. 18, 2021)* (unpublished) ("[The employee] did not allege a mixed-motive claim before the district court."), *and Stevenson v. City of Sunrise, No. 20-*

---

[11] "For instance, an employer would be entitled to [summary judgment] if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves, 530 U.S. at 148.* Neither of these circumstances is present here.

[12] Phillips argues that Legacy failed to move for summary

## IV. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand to the district court for further proceedings.

**REVERSED and REMANDED**.

*12530, 2021 U.S. App. LEXIS 30858, 2021 WL 4806722, at *7 (11th Cir. Oct. 15, 2021)* (unpublished) (concluding that the employee failed to plead a mixed-motive claim), *and Smith, 791 F. App'x at 131* ("[The employee] did not plead or prove a mixed-motive case."). We are thus unpersuaded that Phillips cannot proceed under a mixed-motive theory of discrimination.

Exhibit B

Supplemental Authority

*Tynes v. Fl. Dept. Juvenile Justice*, _F4th_,

2023 U.S.App. LEXIS 32836 (Dec. 12, 2023).

## *Tynes v. Fla. Dep't of Juv. Just.*

United States Court of Appeals for the Eleventh Circuit

December 12, 2023, Decided

No. 21-13245

**Reporter**

2023 U.S. App. LEXIS 32836 *; 30 Fla. L. Weekly Fed. C 465; __ F.4th __; 2023 WL 8593114

LAWANNA TYNES, Plaintiff-Appellee, versus FLORIDA DEPARTMENT OF JUVENILE JUSTICE, Defendant-Appellant.

**Prior History: [*1]** Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 0:18-cv-62891-WPD.

*Tynes v. Fla. Dep't of Juvenile Justice, 2021 U.S. Dist. LEXIS 170172 (S.D. Fla., Sept. 8, 2021)*

**Counsel:** For LAWANNA TYNES, Plaintiff - Appellee: Glenn Ricardo Miller, Law Office of Glenn Miller, NORTH MIAMI BEACH, FL; Arnaldo Velez, Arnaldo Velez, P.A., MIAMI, FL.

For FLORIDA DEPARTMENT OF JUVENILE JUSTICE, Defendant - Appellant: Carri Leininger, James O. Williams Jr., Phillip Benjamin Wiseberg, Williams Leininger & Cosby, PA, NORTH PALM BEACH, FL.

**Judges:** Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

**Opinion by:** GRANT

## Opinion

GRANT, Circuit Judge:

This appeal results from an all-too-common confusion in employment discrimination suits: whether the evidentiary framework set out in *McDonnell Douglas* is a stand-in for the ultimate question of liability in Title VII discrimination cases. We repeat today what our precedents have already made clear: It is not. Properly understood, *McDonnell Douglas* is an evidentiary framework that shifts the burden of production between the parties to figure out if the true reason for an adverse employment action was the employee's race. It is not a set of elements that the employee must prove—either to

survive summary judgment or prevail at trial.

To be sure, in some **[*2]** cases a lack of success in establishing a prima facie case will also reflect a lack of success in showing employment discrimination. But, as both this Court and the Supreme Court have explained, the ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination. The prima facie case in the *McDonnell Douglas* framework can help answer that question—but it cannot replace it.

Here, the Florida Department of Juvenile Justice is distracted by a perceived failure on the part of its former employee, Lawanna Tynes, to meet her initial burden of production at the prima facie stage of *McDonnell Douglas*. But that distraction comes with a price—a lack of focus on whether Tynes put forward enough evidence to show that she was fired because of racial discrimination. The jury thought so, and the Department does not challenge the sufficiency of the evidence for that conclusion. The verdict thus stands.

The Department also argues that Tynes did not adequately plead a claim for race discrimination under *42 U.S.C. § 1981*, which requires a different standard of causation than *Title VII*—and, perhaps more importantly for the **[*3]** Department's purposes here, offers a higher level of potential damages. But again, the Department sets its sights on the wrong target. Though the district court's order expressly relied on its authority to permit amendments to the pleadings under *Rule 15(b)(1) of the Federal Rules of Civil Procedure*, the Department does not even cite *Rule 15(b)(1)* on appeal. That means the challenge is forfeited, so we also affirm the district court's order denying the Department's motion for judgment as a matter of law on Tynes's *§ 1981* claim.

I.

Tynes was employed by the Florida Department of Juvenile Justice for sixteen years. At the time of her

termination, she was the superintendent of the Broward Regional Juvenile Detention Center. The superintendent's responsibilities include overseeing the facility's operations and ensuring that both juvenile detainees and staff are in a safe environment.

One Sunday, while Tynes was off for medical leave, an unusually high number of incidents required an officer to call for back up. The assistant secretary of detention services, Dixie Fosler, followed up by assembling a technical assistance team to review staffing and personnel issues. After the team's review was complete—but before its report was issued—Fosler terminated Tynes. Tynes **[*4]** had no prior negative performance review or reprimands. Even so, the Department offered a laundry list of reasons for the termination: poor performance, negligence, inefficiency or inability to perform assigned duties, violation of law or agency rules, conduct unbecoming of a public employee, and misconduct.

Tynes sued, alleging race and sex discrimination. Her complaint unambiguously alleged two violations of *Title VII of the Civil Rights Act of 1964*, which prohibits employers from terminating employees because of their race or sex. *42 U.S.C. § 2000e-2(a)(1)*. The complaint also stated that it brought "other causes of actions [sic] which can be inferred from the facts herein."

The basis of Tynes's discrimination case was that similarly situated white and male employees were treated differently and that the Department's stated reasons for her termination were pretextual. For comparator evidence, Tynes pointed to Joseph Seeber, a white male, and Daryl Wolf, a white female, who were both superintendents of juvenile detention centers with incidents that reflected a lack of control or failure to abide by the Department's policies.[1] But, unlike Tynes, neither was terminated. Far from it—they received only oral reprimands, were allowed to transfer to different **[*5]** facilities, and were granted multiple opportunities to comply with various recommendations for improvement.

As for pretext, Tynes presented evidence of Fosler's personal bias against her. Gladys Negron, Tynes's direct supervisor, testified that she believed Tynes's termination was based on Fosler's personal feelings rather than professional concerns. She said that Fosler's written report "contained several inaccuracies," and

even characterized the technical assistance team's efforts as a "search-and-kill mission" against Tynes. At trial, Fosler faltered in her testimony; she could not recall the basis for her conclusion that Tynes had engaged in "conduct unbecoming as a public employee," nor could she point to another employee fired without negative performance reviews or prior reprimands.

The jury returned its verdict in favor of Tynes and made specific findings in a special verdict form: (1) "race or sex was a motivating factor"; (2) the Department would not have discharged Tynes if it had not taken into account her race or sex; and (3) Tynes's race was a but-for cause of her termination. The jury awarded $424,600 in compensatory damages and $500,000 in damages for emotional pain and **[*6]** mental anguish. The district court ordered the Department to reinstate Tynes to a similar position—but not under Fosler's supervision.

The Department filed a renewed motion for judgment as a matter of law or, alternatively, for a new trial. It argued that the Department was entitled to judgment on Tynes's Title VII claims because she did not present comparators who were "similarly situated in all material respects" and therefore failed to satisfy her burden to establish a prima facie case under *McDonnell Douglas*. The filing also asserted that Tynes had not properly pleaded her *§ 1981* claim. A *§ 1981* claim differs in two relevant ways from a Title VII claim—there is no cap on damages and the causation standards are higher. *42 U.S.C. § 1981a(b)(3)-(4)*; *see Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1017-19, 206 L. Ed. 2d 356 (2020)*.

The district court denied the motion on both issues. It rejected the Department's Title VII arguments because "the circumstantial evidence regarding the two comparators was sufficient to establish the discrimination claims," and "[c]redibility was for the jury to decide." The court also rejected the *§ 1981* argument, saying that even if Tynes had not properly pleaded that violation in the first place, *Rule 15(b)(1) of the Federal Rules of Civil Procedure* gave it "the discretion to allow an amendment" to the complaint during the **[*7]** trial.

The Department now appeals the district court's denial of its renewed motion for judgment as a matter of law.

**II.**

Judgment as a matter of law is appropriate when "the facts and inferences point so overwhelmingly in favor of

---

[1] At summary judgment, the district court held that Seeber and Wolf were both appropriate comparators.

one party that reasonable people could not arrive at a contrary verdict." *Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1173 (11th Cir. 2010)* (alterations adopted and quotation omitted). We review the denial of a motion for judgment as a matter of law de novo. *Id.*

## III.

### A.

*Title VII of the Civil Rights Act of 1964* outlaws employment discrimination because of "race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. Likewise, *42 U.S.C. § 1981* prohibits employers from intentionally discriminating on the basis of race in employment contracts. *See Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459-60, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975)*; *Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999)*. To prove a claim under either statute, a plaintiff can use direct evidence, circumstantial evidence, or both. *See Jenkins v. Nell, 26 F.4th 1243, 1249 (11th Cir. 2022)*.

Early on, though, it became clear that when only circumstantial evidence was available, figuring out whether the *actual* reason that an employer fired or disciplined an employee was illegal discrimination was difficult and "elusive." *Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 255 n.8, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. After all, an employer can generally fire or discipline an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all," so long as that action "is not for a discriminatory **[*8]** reason.'" *Flowers v. Troup Cnty. Sch. Dist., 803 F.3d 1327, 1338 (11th Cir. 2015)* (quoting *Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)*).

To deal with the difficulties encountered by both parties and courts, the Supreme Court in *McDonnell Douglas* set out a burden shifting framework designed to draw out the necessary evidence in employment discrimination cases. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. It works like this. Step one is for the plaintiff, who establishes what *McDonnell Douglas* calls a "prima facie" case of discrimination when she shows that (1) "she belongs to a protected class," (2) "she was subjected to an adverse employment action," (3) "she was qualified to perform the job in question," and (4) "her employer treated 'similarly situated' employees

outside her class more favorably." *McDonnell Douglas, 411 U.S. at 802*; *Lewis v. City of Union City, 918 F.3d 1213, 1220-21 (11th Cir. 2019)* (en banc). The last requirement is met when the plaintiff presents "evidence of a comparator—someone who is similarly situated in all material respects." *Jenkins, 26 F.4th at 1249* (quotation omitted). The prima facie showing entitles the plaintiff to a rebuttable presumption of intentional discrimination. *United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714-15, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)*. The defendant then rebuts that presumption (if it can) by offering evidence of a valid, non-discriminatory justification for the adverse employment action. *Id. at 714*. Once that justification is offered, the presumption of discrimination falls away and the plaintiff tries **[*9]** to show not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination. *Id. at 714-15*; *Burdine, 450 U.S. at 256*. This final question "merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Lewis, 918 F.3d at 1221* (quoting *Burdine, 450 U.S at 256* (alterations adopted)).

*McDonnell Douglas*, in short, is an evidentiary tool that functions as a "*procedural* device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 521, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*; *see also Burdine, 450 U.S. at 255 n.8*; *Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)*. What *McDonnell Douglas* is *not* is an independent standard of liability under either *Title VII* or *§ 1981*. Nor is its first step, the prima facie case—"establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." *Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)*; *see also Brady v. Off. of the Sergeant at Arms, 520 F.3d 490, 493-94, 380 U.S. App. D.C. 283 (D.C. Cir. 2008)*. Often, however, parties (and sometimes courts) miss this fundamental point and wrongly treat the prima facie case as a substantive standard of liability.

To be fair, the *McDonnell Douglas* court's terminology likely bears some responsibility for the continuing confusion on this point. When the Supreme Court uses the term "prima facie case" in this context, it does so "in a **[*10]** special sense." *Wells v. Colorado Dep't of Transp., 325 F.3d 1205, 1223 (10th Cir. 2003)* (Hartz, J., writing separately). The Court itself has explained that although that phrase may sometimes "describe the

plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue," within the *McDonnell Douglas* framework the term "prima facie case" has a different meaning—it marks "the establishment of a legally mandatory, rebuttable presumption." *Burdine, 450 U.S. at 254 n.7* (citing 9 J. Wigmore, Evidence § 2494 (3d ed. 1940)).

So, although in other contexts a prima facie case typically *does* mean enough evidence for a plaintiff to prevail on a particular claim, here the meaning is different. Under *McDonnell Douglas*, a plaintiff who establishes a prima facie case is entitled to a "legally mandatory, rebuttable presumption" that the employer intentionally discriminated against her. *Id.* What that means is that once a plaintiff satisfies her prima facie burden, the defendant "knows that its failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it." *Hicks, 509 U.S. at 510 n.8*. The presumption of discrimination introduced by the prima facie case thus helps narrow things down and "frame the factual issue" by drawing out an explanation that the plaintiff [*11] can then seek to demonstrate is pretextual. *Burdine, 450 U.S. at 255*. In this way, the prima facie showing exerts a sort of "practical coercion" that forces the defendant to "come forward" with evidence explaining its actions. *Hicks, 509 U.S. at 510 n.8, 511*. It also offers a benefit for the defendant employer, who now has a better idea of what evidence needs to be rebutted. *See id.*

But once the prima facie case has "fulfilled its role of forcing the defendant to come forward with some response," it no longer has any work to do. *Id. at 510-11*. Where "the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is *no longer relevant*." *Aikens, 460 U.S. at 715* (emphasis added). This is so because the "district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff." *Id.* (quotation omitted). So when the defendant employer offers evidence of the reason for its actions toward the plaintiff, the presumption of discrimination created by the prima facie case "simply drops out of the picture." *Hicks, 509 U.S. at 511*; *see also Turnes v. AmSouth Bank, NA, 36 F.3d 1057, 1061 (11th Cir. 1994)*. That is a far cry from serving as a substitute standard necessary to survive summary judgment.

Another reason [*12] for the confusion? A failure in the prima facie case often also reflects a failure of the overall evidence. Even though we do not dwell on

whether the technical requirements of the prima facie case are met once the defendant has met its burden of production, we keep in mind that the *questions* the plaintiff must answer to make a prima facie case are relevant to the ultimate question of discrimination. A plaintiff who fails to prove that she was a member of a protected class, for example, or that she suffered an adverse employment action, will be unable to prove that she was unlawfully discriminated against. *See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1327-28 (11th Cir. 1998)*; *Kidd v. Mando Am. Corp., 731 F.3d 1196, 1202-04 (11th Cir. 2013)*. We'll admit that we have at times framed that analysis in terms of whether the plaintiff has established a prima facie case, but the more fundamental problem with such a failure of evidence is that it means the plaintiff cannot prove a necessary element for his employment discrimination case. *See, e.g., Kidd, 731 F.3d at 1202-04*.

This distinction is important because the components of a prima facie case are not necessarily coextensive with the evidence needed to prove an employment discrimination claim. That is why a plaintiff need not plead the elements of a prima facie case to survive a motion dismiss. [*13] *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*. And it explains why courts in this Circuit do not instruct juries on the prima facie case or the *McDonnell Douglas* framework. *See Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1322 (11th Cir. 1999)*.

It is also why "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith, 644 F.3d at 1328*. Indeed, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id. at 1328*. That is because *McDonnell Douglas* is "only one method by which the plaintiff can prove discrimination by circumstantial evidence." *Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 n.3 (11th Cir. 2005)*. A plaintiff who cannot satisfy this framework may still be able to prove her case with what we have sometimes called a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith, 644 F.3d at 1327-28* (footnote and quotation omitted); *see also Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019)* (*Lewis II*).

This rearticulation of the summary judgment standard arose in large part because of widespread misunderstandings about the limits of *McDonnell*

*Douglas*—the same misunderstandings that persist today. A "convincing mosaic" of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination **[\*14]** in an employment action—the ultimate inquiry in a discrimination lawsuit.[2] *Jenkins, 26 F.4th at 1250*. This approach to analyzing the evidence treats an employment discrimination suit in same way as we would treat any other case—jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case. It is no different than the standards we ordinarily apply in deciding summary judgment and post-trial motions. "If the plaintiff presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination, her claim will survive summary judgment." *Hamilton v. Southland Christian Sch., 680 F.3d 1316, 1320 (2012)*.

All that to say, in deciding motions for summary judgment or judgment as a matter of law, parties already understand that, when we use what we have called the convincing mosaic standard, we look beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination. But parties do not always understand that we are answering that same question when using the *McDonnell Douglas* framework. Under *McDonnell Douglas,* the failure to establish a prima facie case is fatal only where it reflects a failure **[\*15]** to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination. This may mean that there was not enough evidence to infer discrimination. Or it may be that there was no adverse employment action. But the analysis turns on the substantive claims and evidence in the case, not the evidentiary framework.

For these reasons, we have repeatedly emphasized that after a trial we "should not revisit whether the plaintiff established a prima facie case." *Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194 (11th Cir. 2004); see also, e.g., Holland v. Gee, 677 F.3d 1047, 1056 (11th Cir. 2012); Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1150 (11th Cir. 2005); Tidwell v. Carter Fla. 135 F.3d 1422, 1426 n.1 (11th Cir. 1998); Richardson v. Leeds Police Dep't, 71 F.3d 801, 806 (11th Cir. 1995)*; Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1129 (11th Cir. 1984). Instead, we ask only one question: whether there is a sufficient evidentiary basis for the jury to find that the defendant intentionally discriminated against the plaintiff. *Cleveland, 369 F.3d at 1194.*

**B.**

That analysis solves this case. The Department's only argument is that the comparator employees that Tynes offered were not adequate to establish a prima facie case of discrimination under *McDonnell Douglas*. That may be true; under our precedent a comparator employee must be "similarly situated in all material respects"—a high bar to meet. *Lewis, 918 F.3d at 1218*. But the jury's factual inquiry was whether the Department intentionally discriminated against Tynes, and its answer was "yes." The Department does not contend **[\*16]** that the evidence, taken as a whole, could not support the jury's verdict. By focusing exclusively on Tynes's comparator evidence, the Department has forfeited any challenge to the ultimate finding of discrimination.

Of course, the strength of Tynes's comparator evidence is relevant to the ultimate question of intentional discrimination. *Holland, 677 F.3d at 1056-57*. But to the extent that there are material differences between Tynes and her comparators at this stage of the case, it is the jury's role—not ours—to determine how much weight the comparator evidence should be given. In other words, it is possible that her comparators were insufficient to establish a prima facie case yet still relevant to the ultimate question of intentional discrimination. *See Lewis II, 934 F.3d at 1187-88*. To win after trial, the Department would have needed to explain why the evidence, taken as a whole, was insufficient to support the jury's verdict. Because it failed to do so, we affirm the judgment of the district court denying the Department's renewed motion for judgment

---

[2] A plaintiff proving her case through the convincing mosaic standard may point to any relevant and admissible evidence. As we have said, "no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith, 644 F.3d at 1328*. Evidence that is likely to be probative is "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins, 26 F.4th at 1250* (quotation omitted). Given the wide scope of available evidence, the convincing mosaic standard "can be of particular significance when the plaintiff cannot identify a similarly situated comparator," as the *McDonnell Douglas* framework requires. *Bailey v. Metro Ambulance Servs., Inc., 992 F.3d 1265, 1273 n.1 (11th Cir. 2021)*.

as a matter of law on the Title VII claims.

**IV**.

The Department also challenges the jury's verdict on Tynes's *§ 1981* claim, arguing that her complaint did not adequately plead the *§ 1981* claim and that **[\*17]** she did not prove that race was a "but-for" cause of her termination.[3] The Department, however, has forfeited both arguments.

The Department is right about one thing—Tynes's complaint may not have set out a separate claim under *§ 1981*. *See Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1322-23 (11th Cir. 2015)* (requiring a complaint to set out a different count for each cause of action or claim for relief).[4] Even so, the district court held that it had discretion to allow an amendment to the pleadings during the trial under *Rule 15(b)(1)*. That rule permits the pleadings to be amended at trial when "a party objects that evidence is not within the issues raised in the pleadings" so long as "doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." *Fed. R. Civ. P. 15(b)(1)*. The district court stated that it found that permitting amendment would not prejudice the Department.

The Department does not challenge the district court's authority under *Rule 15*. Indeed, at oral argument counsel expressed a lack of familiarity with that rule. And when "an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any **[\*18]** challenge of that ground." *Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680 (11th Cir. 2014)*. So while it is not clear whether the district court properly invoked *Rule 15(b)(1)*—after all, Tynes did not actually

_____

[3] In *Comcast*, the Supreme Court held that but-for causation was required to prove a *§ 1981* claim. *140 S. Ct. at 1019*.

[4] In addition to the Title VII claims, the complaint says it brings "other causes of actions [sic] which can be inferred from the facts herein." But it does not set out a *§ 1981* claim in its own count; instead, it refers to *§ 1981* in the jurisdictional section of the complaint as a federal question presented in the case. What's more, each of Tynes's Title VII counts alleges that she "is a member of a protected class under *§ 1981*," and the prayer for relief requests that the court "[a]djudge and decree that Defendant has violated *42 U.S.C. § 1981*."

move to amend her complaint—any challenge on that ground is forfeited. *See Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1352 (11th Cir. 2011); Green Country Food Mkt., Inc., v. Bottling Grp., LLC, 371 F.3d 1275, 1281 (10th Cir. 2004)*.

The Department's second *§ 1981* argument—that Tynes did not prove that race was a but-for cause of her termination—is also forfeited. In its post-trial motion, the Department argued that because Tynes did not plead a *§ 1981* claim, her complaint did not *allege* that race was a but-for cause. But it did not argue that Tynes failed to *prove* that race was a but-for cause.[5] "It is well-settled that we will generally refuse to consider arguments raised for the first time on appeal." *Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1249 (11th Cir. 2012)*. The Department cannot now repackage its pleading argument into a claim that Tynes did not prove an essential element at trial.

* * *

After a full trial on the merits, a defendant cannot successfully challenge the jury's verdict by arguing only that the plaintiff's comparators were inadequate or that the prima facie case was otherwise insufficient. Here, the Department was required to demonstrate why the record evidence could not support the jury's verdict and failed to do so. Because the Department also failed to adequately **[\*19]** challenge the grounds upon which the district court denied its motion with respect to Tynes's *§ 1981* claim, the district court's order is **AFFIRMED**.

**Concur by:** NEWSOM

# Concur

NEWSOM, Circuit Judge, concurring:

Today's majority opinion offers an important critique of the role that *McDonnell Douglas*'s burden-shifting analysis has come to play in deciding Title VII cases. In

_____

[5] The clear intention of the Department's *Rule 50* motions was to challenge the adequacy of the pleadings. The Department may contend (though it did not do so directly before this Court) that it preserved a proof-based argument with this statement: "Plaintiff offered no testimony or evidence at trial that her race was the 'but-for' cause of her termination." In context, both we and the district court read this as support for the pleading-based argument, but in any event, such a statement is far too conclusory on its own to preserve the issue for appeal.

particular, the majority explains that *McDonnell Douglas* (1) provides only an "evidentiary framework" and (2) was never meant to establish "an independent standard of liability" or specify a "set of elements that the employee must prove—either to survive summary judgment or prevail at trial." Maj. Op. at 2, 9. Unfortunately, as the majority notes, "parties (and sometimes courts)" often "miss this fundamental point and wrongly treat" *McDonnell Douglas*, and in particular its initial prima-facie-case step, "as a substantive standard of liability." *Id.* at 9. And although this case doesn't arise on summary judgment, the majority correctly observes that the overreading of—and consequent overemphasis on—*McDonnell Douglas* has become particularly acute at the *Rule 56* stage, where courts have increasingly taken to treating the test's prima-facie-evidence benchmark [*20] "as a substitute standard necessary to survive summary judgment." *Id.* at 11; *see also id.* at 9-12 (detailing the problems with courts' applications of *McDonnell Douglas* at summary judgment).

Yes, yes, and yes—I completely agree. I'll confess, though, that I've developed an even deeper skepticism of *McDonnell Douglas.* The majority opinion seeks to put courts back on the right path in their application of *McDonnell Douglas*; I tend to think we might be better off on an altogether different path. Here's what I mean: I'd long taken for granted that *McDonnell Douglas*'s three-step framework provided the presumptively proper means of deciding Title VII cases at summary judgment. I've changed my mind. *McDonnell Douglas*, it now seems to me, not only lacks any real footing in the text of *Rule 56* but, worse, actually obscures the answer to the only question that matters at summary judgment: Has the plaintiff shown a "genuine dispute as to any material fact"—in the typical Title VII case, as to whether her employer engaged in discrimination based on a protected characteristic. Instead of *McDonnell Douglas*—which, to be clear, neither the Supreme Court nor we have ever said provides the sole mechanism for [*21] adjudicating summary-judgment motions— courts should employ something like our oft-maligned "convincing mosaic" standard, which I had always viewed as something of a rogue but which, upon reflection, much more accurately captures and implements the summary-judgment standard. For me, it's quite the turnabout, so I should explain myself.

# I

Title VII of the landmark *Civil Rights Act of 1964* broadly prohibits workplace discrimination. In relevant part, its operative provision states that—

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ....

*42 U.S.C. § 2000e-2(a)(1)*. Title VII was (and is) an historic piece of legislation that tackled (and continues to tackle) one of the country's weightiest social problems. Legally speaking, though, it's just a statute, no different from hundreds of others. And so, as the Supreme Court has repeatedly reminded us, the "ordinary rules" of civil procedure apply to Title VII cases. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* ("[T]he ordinary rules for assessing the sufficiency [*22] of a complaint apply."); *see also, e.g., U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)* ("[N]one of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact.").

Many, if not most, Title VII cases are decided at summary judgment. The "ordinary rule[]" for evaluating the propriety of summary judgment, of course, is *Federal Rule of Civil Procedure 56*:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

*Fed. R. Civ. P. 56(a)*. In the mine-run discrimination case, the key issue is whether the employer engaged in some action, in the statute's words, "because of" an employee's race, sex, religion, or other protected characteristic. Accordingly, the fundamental question at summary judgment is—or should be—whether there is a genuine dispute of material fact about that all-important causation issue.

But not all analytical frameworks hew closely to that question. Briefly, we assess employment-discrimination cases at summary judgment using one or more of three approaches. First, a reviewing court might consider whether the plaintiff has pointed to *direct* evidence of discrimination. If the case instead turns [*23] on *circumstantial* evidence, the court might ask—second— whether the plaintiff can survive *McDonnell Douglas*'s

burden-shifting analysis or—third—whether she can assemble what we have called a "convincing mosaic" of evidence suggesting discrimination, *Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)*.

In terms of consistency with *Rule 56*, the direct-evidence analysis, reserved for cases featuring particularly "blatant" and overtly discriminatory comments or conduct, *see Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020)*, performs well enough. But direct-evidence cases are increasingly rare, so most Title VII suits these days are turn on circumstantial evidence. Among those, *McDonnell Douglas* is clearly the dominant framework, with "convincing mosaic" trailing along as something of an afterthought.[1] And until recently, that seemed exactly right to me—I had marinated in *McDonnell Douglas* and its progeny for so long that I had come to view the convincing-mosaic test as an interloper, a hack contrived to save cases that might otherwise go out on summary judgment.

I've concluded that I was wrong about that—as in 180° wrong. Upon reflection, it now seems to me that *McDonnell Douglas* is the interloper—*it* is the judge-concocted doctrine that obfuscates the critical **[*24]** inquiry. The convincing-mosaic standard, by contrast—despite its misleadingly florid label—is basically just *Rule 56* in operation. Quite unlike *McDonnell Douglas*, it actually asks the key question: Does the "record, viewed in a light most favorable to the plaintiff, present[] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker"? *Smith, 644 F.3d at 1328* (internal quotations and footnote omitted). Strip away the grandiloquence—after all, "convincing mosaic of circumstantial evidence" just means "evidence"—and that is *exactly Rule 56*'s summary-judgment standard.

In the discussion that follows, I'll explain briefly why I've

---

[1] So far as I can tell, we have considered the convincing-mosaic test in only five published Title VII decisions, three of which involved cursory single-paragraph rejections of a plaintiff's invocation of it. *See, e.g., Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011); Flowers v. Troup Cnty. Sch. Dist., 803 F.3d 1327, 1335 (11th Cir. 2015); Trask v. Secretary, Dep't of Veterans Affs., 822 F.3d 1179, 1193 (11th Cir. 2016), abrogated on other grounds by Babb v. Wilkie, 140 S. Ct. 1168, 206 L. Ed. 2d 432 (2020); Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019)* (on remand); *Bailey v. Metro Ambulance Servs., Inc., 992 F.3d 1265, 1273 n.2 (11th Cir. 2021)*.

come to believe (1) that *McDonnell Douglas* is the wrong framework to apply in deciding Title VII cases at summary judgment and (2) that our convincing-mosaic standard—which I'd rebrand slightly—is the right one. I'll also try to anticipate and respond to a few objections.

**II**

To start, why the loss of faith in *McDonnell Douglas*? In short, I fear that it doesn't reliably get us to the result that *Rule 56* requires. *See also* Maj. Op. at 11 (noting that "the components of a prima facie case are not necessarily coextensive with the evidence needed **[*25]** to prove an employment discrimination claim"). And in retrospect, that shouldn't be particularly surprising, because *McDonnell Douglas*'s reticulated, multi-step framework forces courts to ask and answer a series of questions that only peripherally relate to the one that *Rule 56* poses: Has the plaintiff presented "a genuine issue as to any material fact"—in the typical Title VII case, about her employer's discriminatory intent? Let me unpack my concern, in three parts.

First, as a threshold matter, *McDonnell Douglas* seems (in retrospect) awfully made up. Here's how the Supreme Court has described its handiwork:

> In *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that **[*26]** the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* (internal citations and footnote omitted). There's certainly no textual warrant in Title VII or the Federal Rules for so elaborate a scheme, and so far as I know, no one has ever even sought to justify it as rooted in either. Perhaps a product of its time, the whole thing is

quite legislative, quite *Miranda*-esque—"set forth," to use the Supreme Court's own words. *See also* Maj. Op. at 7-8 (observing that *McDonnell Douglas* "set out" the burden-shifting framework). And for me, the framework's made-up-ed-ness is a flashing red light—prima facie evidence, if you will, that something is amiss. *Cf. Club Madonna Inc. v. City of Miami Beach, 42 F.4th 1231, 1261 (11th Cir. 2022)* (Newsom, J., concurring) ("[U]nelected, unaccountable federal judges shouldn't make stuff up.").

Second, whatever it was that the Supreme Court initially conjured, it seems to have taken on a life of its own. Perhaps most jarringly, *McDonnell Douglas's* burden-shifting framework has become the presumptive means of resolving Title VII cases at summary judgment—despite the facts (1) that *McDonnell Douglas* itself arose not on summary judgment but out of a bench trial, *see Green v. McDonnell Douglas Corp., 299 F. Supp. 1100, 1102 (E.D. Mo. 1969)*, and (2) that, **[\*27]** so far as I can tell, the Supreme Court has specifically addressed *McDonnell Douglas's* application to Title VII cases at summary judgment only once, and in that decision held that it didn't apply, *see Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 118-19, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985)*.[2] Even beyond that, despite the Supreme Court's occasional reminders that *McDonnell Douglas's* "procedural device" was intended "only to establish an order of proof and production," *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 521, 113 S. Ct. 2742,*

125 L. Ed. 2d 407 (1993),[3] lower courts have become progressively obsessed with its minutiae, allowing it to drive substantive outcomes. The framework's constituent details have grown increasingly intricate and code-like, as courts have taken to forcing a holistic evidentiary question—whether all the evidence, viewed in the light most favorable to the plaintiff, creates a genuine factual dispute—into a collection of distinct doctrinal pigeonholes. For instance, we have explained—and we're hardly alone—that *McDonnell Douglas's* first stage, the prima facie case, further entails a "four-step test," one step of which requires the plaintiff to show that she was treated differently from a similarly situated "comparator." *Lewis v. City of Union City, 918 F.3d 1213, 1220-22 (11th Cir. 2019)* (en banc). We've then treated these requirements as a series of standalone, case-dispositive elements—boxes to be checked—rather **[\*28]** than simply asking the controlling question whether the facts give rise to a triable issue of discrimination. In so doing, we've mistakenly allowed the tool to eclipse (and displace) the rule.[4]

Finally, and perhaps worst of all, it now strikes me that the *McDonnell Douglas* three-step—particularly as supplemented by the first step's constituent four-step—obscures the actual Title VII inquiry, especially at summary judgment. I'll readily confess that others have beaten me to this conclusion, but they make for pretty good company. For instance, while a judge on the D.C. Circuit, Justice Kavanaugh described the fixation on the plaintiff's prima facie case as "a largely unnecessary sideshow" that "has not benefited employees or employers," has not "simplified or expedited court proceedings," and, in fact, "has done exactly the opposite, spawning enormous confusion and wasting litigant and judicial resources." *Brady v. Office of*

---

[2] Ironically, resolving cases at summary judgment seems to be *McDonnell Douglas's* sole remaining office. The Supreme Court has clarified that its burden-shifting analysis is inapplicable both at the pleading stage, *see Swierkiewicz, 534 U.S. at 508*, and in deciding post-trial motions, *see Aikens, 460 U.S. at 715*, and most courts of appeals have excised references to *McDonnell Douglas's* framework from their pattern jury instructions, *see* Timothy M. Tymkovich, *The Problem with Pretext, 85 Denv. U. L. Rev. 503, 528 & nn.189-91 (2008)* (collecting cases).

To be fair, the Court has utilized *McDonnell Douglas* to evaluate claims under *other* statutes at summary judgment. None of those decisions, though, has squarely addressed *McDonnell Douglas's* consistency (or inconsistency) with *Rule 56. See, e.g., Babb v. Wilkie, 140 S. Ct. 1168, 1172, 206 L. Ed. 2d 432 (2020); Young v. United Parcel Serv., Inc., 575 U.S. 206, 231, 135 S. Ct. 1338, 191 L. Ed. 2d 279 (2015); Raytheon Co. v. Hernandez, 540 U.S. 44, 51-52, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003); O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996)*.

---

[3] *See also Burdine, 450 U.S. at 255 n.8* (observing that the *McDonnell Douglas* framework was designed merely to help the parties progressively "sharpen the inquiry into the elusive factual question of intentional discrimination").

[4] *See Sandra F. Sperino, Rethinking Discrimination Law, 110 Mich. L. Rev. 69, 71 (2011)* ("[T]he key question in modern discrimination cases is often whether the plaintiff can cram his or her facts into a recognized structure and not whether the facts establish discrimination."); *see also* Deborah A. Widiss, *Proving Discrimination by the Text, 106 Minn. L. Rev. 353, 374-75 (2021)* ("In practice, however, the causation standard employed is less important than whether a plaintiff can successfully squeeze the evidence into an arcane and complicated body of judge-made law ....").

*Sergeant at Arms, 520 F.3d 490, 494, 380 U.S. App. D.C. 283 (D.C. Cir. 2008)*. Worse, he explained, the *McDonnell Douglas* framework isn't just wasteful, it is potentially **[\*29]** misleading in that it entices reviewing courts to focus on non-core issues: At summary judgment, the prima facie case is "almost always irrelevant" and "usually [a] misplaced" inquiry—because once the defendant offers an explanation for its decision, "whether the plaintiff really" made out a prima facie case no longer matters. *Id. at 493-94* (quoting *Aikens, 460 U.S. at 715*). Rather, then-Judge Kavanaugh continued, once the defendant explains itself, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that . . . the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id. at 494*. That, of course, *is* the *Rule 56* question—shorn of all its *McDonnell Douglas* prophylaxis.[5]

To be clear, Justice Kavanaugh is hardly alone. Justice Gorsuch made similar observations during his tenure on the Tenth Circuit. Using the very same descriptor that Justice Kavanaugh had, he explained that *McDonnell Douglas*'s staged inquiries "sometimes prove a sideshow," *Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1202 n.12 (10th Cir. 2008)*, that the framework itself "has proven of limited value," *Walton v. Powell, 821 F.3d 1204, 1210 (10th Cir. 2016)*, and that courts too often get bogged down "engag[ing] in **[\*30]** the

business of trying to police the often fine line between" when *McDonnell Douglas* does and doesn't apply, *id. at 1211*.[6]

\* \* \*

So, what's my takeaway regarding *McDonnell Douglas*? From a case that didn't even arise on summary judgment has emerged a purported "procedural device" that, in day-to-day operation, disregards the duly promulgated rules of summary-judgment procedure, that overrides the substance of Title VII, and whose multi-step burden-shifting formula obscures the decisive question: Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee "because of" a protected characteristic?

**III**

So, as it turns out, there's plenty not to like about *McDonnell Douglas* as a summary-judgment tool. And what of the convincing-mosaic standard, which I've confessed to having long dismissed as secondary corollary of sorts or, worse, a manipulable workaround? Turns out there's a lot to like.

*McDonnell Douglas*, it now seems to me, leads us away from—or at the very least is orthogonal to—*Rule 56*'s north star. By contrast, the convincing-mosaic standard points, even if a little clumsily, right **[\*31]** at it. Here's what we said in *Smith*:

---

[5] One clarification: While the prima-facie-case question is undoubtedly "irrelevant" as a formal matter following an employer's summary-judgment motion—at that point, the employer having explained itself, the focus turns to the ultimate question—that's not to say that the sort of proof that might inform a plaintiff's prima facie showing is irrelevant as an evidentiary matter. As the majority opinion observes, "the *questions* the plaintiff must answer to make a prima facie case are relevant to the ultimate question of discrimination"— whether she was a member of a protected class, whether she suffered an adverse employment decision, how her colleagues were treated, etc. Maj. Op. at 11. So it may well be that a plaintiff who lacks the evidence necessary to make out a prima facie case should lose at summary judgment. Importantly, though, she shouldn't lose because she has failed to dot her Is and cross her Ts under *McDonnell Douglas*, but rather because she has failed to proffer evidence that gives rise to a genuine issue of material fact concerning whether her employer engaged in unlawful discrimination. *Cf. also id.* at 11 ("A failure in the prima facie case often also reflects a failure of the overall evidence.").

[6] Others have voiced similar complaints. Judge Easterbrook has described Title VII summary-judgment cases generally as implicating a "rat's nest of surplus 'tests.'" *Ortiz v. Werner Enters., Inc., 834 F.3d 760, 766 (7th Cir. 2016)*. Judge Hartz has observed that the *McDonnell Douglas* framework, in particular, "only creates confusion and distracts courts from 'the ultimate question of discrimination.'" *Wells v. Colorado Dep't of Transp., 325 F.3d 1205, 1221 (10th Cir. 2003)* (Hartz, J., concurring). Judge Wood has lamented the "snarls and knots that the current methodologies used in discrimination cases of all kinds have inflicted on courts and litigants alike" and expressed her view that *McDonnell Douglas*'s successive inquiries have "lost their utility." *Coleman v. Donahoe, 667 F.3d 835, 863 (7th Cir. 2012)* (Wood, J., concurring). And Judge Tymkovich, training his critique on *McDonnell Douglas*'s third step, has complained that the "focus on pretext has shifted the emphasis of an employment discrimination case away from the ultimate issue of whether the employer discriminated against the complaining employee." *Tymkovich, supra note 2, at 505*.

[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.

*644 F.3d at 1328* (internal quotation marks, citations, and footnote omitted). Stripped of the rhetorical flourish—the superfluous "convincing mosaic of" preface—that is, in essence, just a restatement of *Rule 56*'s summary-judgment standard. No bells, no whistles—just reasonable inferences and triable facts.

What accounts, then, for the convincing-mosaic standard's failure to launch? Well, inertia for starters. By the time the convincing-mosaic option came along, at least as a stand-alone test, parties, courts, and commentators had been debating and applying *McDonnell Douglas* for decades. Separately, I think the convincing-mosaic framework suffers from a branding problem of sorts, of which its rhetoric is a big part. The informal moniker—"convincing mosaic"—just sounds contrived, **[*32]** and thus sends formalists like me into a dither. It's also a little misleading: Satisfying the test requires *neither* "convincing" a reviewing court *nor* presenting enough evidence to compose a "mosaic." Summary judgment turns on the existence of a genuine factual dispute; courts deciding summary-judgment motions don't weigh evidence, and they don't decide (let alone announce) whether they're convinced. And a mosaic—in its truest sense a collection—isn't necessary to defeat summary judgment; a single item of evidence can at least theoretically suffice.

In any event, as between the two current contestants, it now strikes me that the convincing-mosaic standard—which I'd be inclined to re-brand as, perhaps, just the "*Rule 56*" standard, to denude it of its unnecessary ornamentation—comes much closer to capturing the essence of summary judgment than does *McDonnell Douglas*.

## IV

Let me try, in closing, to anticipate and address a few likely objections.

## A

First, does any of this really matter? I think it does. We shouldn't perpetuate the existing regime by dint of its sheer existence. We should strive to get the cases right according to the governing law. And for present purposes, the "governing law" comprises **[*33]** (1) Title VII's prohibition on employment discrimination perpetrated "because of" an employee's protected characteristics, *42 U.S.C. § 2000e-2(a)(1)*, and (2) *Rule 56*'s focus on the existence of a "genuine dispute" about that causation issue, *see Fed. R. Civ. P. 56(a)*. For reasons I've tried to explain, *McDonnell Douglas* is at best only tangentially directed to those issues; the convincing-mosaic standard—or something like it—is much more immediately so.

Moreover, I fear that our increasingly rigid application of *McDonnell Douglas* may actually be causing us to get cases *wrong*—in particular, to reject cases at summary judgment that should, under a straightforward application of *Rule 56*, probably proceed to trial. A plaintiff who can marshal strong circumstantial evidence of discrimination but who, for whatever reason, can't check all of the *McDonnell-Douglas*-related doctrinal boxes—for instance, because she can't *quite* show that her proffered comparator is sufficiently "similarly situated," *see supra* at 9—may well lose at summary judgment, whereas a plaintiff who has a slightly better comparator but little other evidence of discrimination might survive. Especially in light of *Rule 56*'s plain language—which focuses on the existence of a "genuine dispute **[*34]** as to any material fact," *Fed. R. Civ. P. 56(a)*— that seems a little topsy-turvy.

## B

Second, wouldn't a wholehearted embrace of the convincing-mosaic framework result in more cases going to trial and thereby overburden already busy district courts? Well, maybe. To the extent that *McDonnell Douglas*'s judge-created elements and sub-elements are currently causing courts to grant summary judgment in cases where, in *Rule 56* terms, a genuine dispute exists, then yes, ditching them in favor of something that looks more like the convincing-mosaic standard would lead to more trials.[7] But inasmuch as

---

[7] Reasonable minds can differ about how many cases are wrongly decided because of *McDonnell Douglas*. Many of our early cases doubted whether an employer's motive is

that's a problem, courts shouldn't manufacture or jerry-rig doctrine to fix it. I've never thought that judges should decide cases in an effort to drive good outcomes or avoid bad ones, and now's not the time to start. For good or ill, the facts are (1) that *Title VII* gives plaintiffs a right to a jury trial in appropriate circumstances, *see 42 U.S.C. § 1981a(c)*, and (2) that *Rule 56* forestalls jury trials only where there is "no genuine dispute as to any material fact"—here, as to the employer's causal motivation. Some cases will warrant trial under *Rule 56*'s standard, some won't. But neither Title VII nor the Federal Rules make an exception for claims that, **[*35]** while legally viable, might prove time- and labor-intensive.

## C

Finally, isn't the idea of scrapping *McDonnell Douglas* in favor of something like the convincing-mosaic standard pretty radical? Not particularly. After all, we've been using (or at least incanting) the convincing-mosaic standard as an alternative to *McDonnell Douglas* for more than a decade now, and other courts have similarly renounced any slavish devotion to *McDonnell Douglas*'s rigid three-step analysis.

Interestingly, we borrowed the phrase "convincing mosaic" from the Seventh Circuit. *See Smith, 644 F.3d at 1328* (quoting *Silverman v. Board of Educ. of Chi., 637 F.3d 729, 734(7th Cir. 2011)*). That court has since (and wisely) jettisoned the "convincing mosaic" label, but not its substance. Instead, it has adopted what it calls a "direct method"—in effect, a merger of our direct-evidence and convincing-mosaic frameworks—which permits an employee to oppose her employer's summary-judgment motion using any evidence, whether technically direct or circumstantial, so long as it creates a triable issue of discrimination. *See Sylvester v. SOS Child.'s Vills. Ill., Inc., 453 F.3d 900, 902-03 (7th Cir. 2006)*. The court has described its approach in the following terms, which, to me, sound pretty convincing-mosaic-ish:

---

susceptible to summary judgment at all. *See Chapman v. AI Transp., 229 F.3d 1012, 1025 (11th Cir. 2000)* (en banc) (collecting cases). When we held that it is, we did so on the ground that "the summary judgment rule applies in job discrimination cases just as in other cases" and, thus, that "[n]o thumb is to be placed on either side of the scale." *Id. at 1026*. But the questions (1) whether the summary-judgment procedure applies to Title VII cases—of course it does—and (2) how many cases it will weed out are, to my mind, different.

[The] legal standard . . . is simply whether the evidence would **[*36]** permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

*Ortiz, 834 F.3d at 765*.

For its part, the D.C. Circuit has likewise taken steps to reorient *McDonnell Douglas* toward the ultimate question whether the plaintiff has presented a genuine factual dispute about intentional discrimination. By the time the employer files a summary-judgment motion, that court has explained, it "ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision" at step two of *McDonnell Douglas*'s three-step analysis. *Brady, 520 F.3d at 493*. At that point, the D.C. Circuit continued, "whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and **[*37]** 'drops out of the picture.'" *Id.* (quoting *Hicks, 509 U.S. at 510-11*, and *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*). Rather, the reviewing court then "has before it all the evidence it needs to decide" the ultimate question—namely, "whether the defendant intentionally discriminated against the plaintiff." *Id. at 494* (quoting *Aikens, 460 U.S. at 715*). So, to avoid any "lingering uncertainty," the D.C. Circuit concluded by emphasizing that in the mine-run summary-judgment case, where the employer has offered a non-discriminatory reason for its action, a reviewing court *should not* . . . decide whether the plaintiff actually made out a prima facie case" under *McDonnell Douglas* but, rather, should resolve the "central question" whether the "employee [has] produced sufficient evidence for a reasonable jury to find" that "the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.*

All of which is simply to say: It's not quite as heretical as I once assumed to question whether *McDonnell Douglas* is *the*—or even *an*—appropriate means of deciding Title VII cases at summary judgment. And it

wouldn't be quite as radical as it once seemed to shift the focus away from *McDonnell Douglas*'s judge-made formulation and toward *Rule 56*'s plain [*38] language.[8]

_____

[8] Bulky footnote alert: At this point, inside baseballers may be asking, "What about the en banc decision in *Lewis*, which you wrote?" *See Lewis v. City of Union City, 918 F.3d 1213 (11th Cir. 2019)* (en banc). Fair question. To be clear, though, I needn't renounce *Lewis*. For what it set out to do—as we explained there, "to clarify the proper standard for comparator evidence in intentional-discrimination cases" brought under *McDonnell Douglas*'s burden-shifting regime, *id. at 1220*—I continue to believe that *Lewis* gave the right answer. It's just that I've come to doubt that *McDonnell Douglas*—and our downstream application of it—asks the correct questions.

In *Lewis*, we noted that a Title VII plaintiff can respond to her employer's summary-judgment motion in "a variety of ways"—"one of which," we said, "is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas*," whose first part, of course, requires the plaintiff to make out a prima facie case of discrimination. *Id. at 1217*. We further noted the Supreme Court's repeated directive that one of the ways—seemingly, the presumptive way—that the plaintiff can demonstrate a prima facie case is by satisfying a constituent four-step test, one prong of which requires her to show "that she was treated differently from another 'similarly situated' individual—in [*39] court-speak, a 'comparator.'" *Id.* (quoting *Burdine, 450 U.S. at 258-59*). Faced with an entrenched intra-circuit split, we granted en banc rehearing to answer a discrete question about the proper implementation of that *McDonnell-Douglas*-related "comparator" element: "What standard does the phrase 'similarly situated' impose on the plaintiff: (1) 'same or similar,' (2) 'nearly identical,' or (3) some other standard?" *Id. at 1218*. Our response: A Title VII plaintiff must show that her proposed comparators are "similarly situated in all material respects." *Id. at 1224-29*.

I stand by *Lewis*'s answer to that operational question—one of the many such questions that lower courts, including ours, have taken to asking in the wake of *McDonnell Douglas*. I will confess, though, that the question that we confronted and answered in *Lewis* now strikes me as awfully weedsy—indicative, I worry, of an analysis that (to continue the botanical metaphor) risks missing the forest for the trees. Rather than getting tangled up in prima facie cases, four-step tests, similarly situated comparators, and the like, I've come to believe that we'd be better off cutting straight to the *Rule 56* chase: Has the plaintiff presented evidence that gives rise to a genuine factual dispute about whether her employer engaged in intentional discrimination? To my surprise, the convincing-mosaic standard—shorn of its frills—does pretty much exactly that. (Interestingly, and perhaps tellingly, on remand from our en banc decision, Lewis *won*—*i.e.*, survived summary judgment—on convincing-mosaic grounds. *See Lewis, 934*

## V

"Wisdom too often never comes, and so one ought [*40] not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Tr. Co., 335 U.S. 595, 600, 69 S. Ct. 290, 93 L. Ed. 259, 1949-1 C.B. 223 (1949)* (Frankfurter, J., dissenting). For a while now, I've uncritically accepted the *McDonnell Douglas* framework as the proper means of resolving Title VII cases on summary judgment, and I've long scorned the convincing-mosaic standard as a judge-made bypass. I repent. I had it backwards. Whereas *McDonnell Douglas* masks and muddles the critical *Rule 56* inquiry, "convincing mosaic," for all intents and purposes, *is* the critical *Rule 56* inquiry. On a going-forward basis, therefore, I would promote the convincing-mosaic standard to primary status and, to the extent consistent with Supreme Court precedent, relegate *McDonnell Douglas* to the sidelines.

_____

**End of Document**

_____

*F.3d at 1186-90* (on remand)).